UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**BRAD CHARLES FISHER,** and
**JANET ELIZABETH FISHER**,

Debtors.

Case No. **07-61338-11**

## MEMORANDUM of DECISION

At Butte in said District this 15th day of April, 2008.

In this Chapter 11 bankruptcy, after due notice, a hearing was held April 1, 2008, in Butte

on the Motion to Convert filed by the United States Trustee ("UST") on February 4, 2008, and on

the Montana Department of Revenue's ("MDOR") Motion to Covert filed February 5, 2008.

Neal G. Jensen ("Jensen") of Great Falls, Montana, attorney for the UST, prosecuted the UST's

Motion and attorney Lynn H. Butler ("Butler") of Austin, Texas prosecuted the MDOR's

Motion. Debtors were represented at the hearing by their attorney of record, R. Clifton Caughron

("Caughron") of Helena, Montana. Debtors Brad Fisher ("Brad") and Janet Fisher ("Janet")

testified as did Kim Davis of the MDOR. The UST's Exhibits 1 through 10 and the MDOR's

1

Exhibits 1 through 22 were admitted into evidence without objection.[1]  Debtors' rebuttal Exhibit A was admitted into evidence over the objection of the MDOR and Debtors' Exhibit B was admitted into evidence without objection.

BACKGROUND

Debtors reside in Helena, Lewis and Clark County, Montana.  Debtors have four children, two of whom were under the age of 18 at the time Debtors' filed their bankruptcy petition.  Debtors list four motor vehicles in their amended Schedule B and also own the home in which they live.  The "distraint sale" value of Debtors' home is $411,500, per amended Schedule A, but Debtors agree that their home is worth "substantially" more.

Brad previously sold insurance for American Family Life Assurance Company of Columbus ("Aflac"), but ceased selling insurance policies in 2005.  Brad has more recently been employed by Lithia Chevrolet of Helena since January of 2007 and Janet is employed as an administrator by Security Fire Protection.  Debtors formed BCF Enterprises, Inc. ("BCF") in December of 1998, but the corporation was involuntarily dissolved by the State of Montana in approximately December of 2000.  Debtors have nevertheless continued to operate BCF as a sole proprietorship.  The Court's understanding is that Brad receives his Aflac commissions through BCF and pays various so-called business expenses through BCF.

Debtors' commenced this case on November 14, 2007, by filing a voluntary Chapter 11 bankruptcy petition.  Page 1 of Debtors' voluntary petition (Official Form 1) discloses the

---

[1]  The MDOR's Exhibit 21 filed at docket entry no. 53 was deleted and the MDOR was instructed to refile Exhibit 21 with the names and social security numbers of Debtors' children redacted.  Redacted Exhibit 21 was filed by the MDOR on April 4, 2008, and is found at docket entry no. 62.

2

following: Type of Debtor - Individual; Nature of Debts - Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose"; Chapter 11 Debtors - Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D); and Statistical/Administrative Information - Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.  Debtors' November 14, 2007, petition was accompanied by Exhibit D - Individual Debtor's Statement of Compliance with Credit Counseling Requirement, a List of Creditors Holding 20 Largest Unsecured Claims, and a mailing matrix. Debtors also filed on November 14, 2007, a Certificate of Counseling and various earnings statements.

After requesting additional time within which to file their schedules and statement of financial affairs, Debtors filed all their Schedules, a Statement of Financial Affairs and their Form 22B (Statement of Current Monthly Income) on December 11, 2007.[2]  Debtors' Schedule A listed real property valued at $403,000.  Debtors' Schedule B lists personal property valued at $87,870.  Debtors list secured claims with a gross value of $1,476,802.35 on Schedule D, list priority claims of $14,000 on Schedule E, and list unsecured claims totaling $100,183 on Schedule F.  Per Debtors' Schedules I and J, Debtors have a combined average monthly income of $9,218.87 and average monthly expenses of $9,210.95, leaving Debtors with $7.92 of monthly net income.

The UST asserts in the Motion to Convert that Debtors agreed, at the Initial Debtor

---

[2]  Debtors filed a supplemental Schedule J on December 31, 2007, setting forth their Business Income and Expenses.

Interview, to provide various documents to the UST and to amend their Schedules E and J no later than January 14, 2008. Debtors also agreed to file a combined Monthly Operating Report ("MOR") for November and December of 2007 no later than January 31, 2008, and also agreed to provide the UST with a laundry list of other items no later than January 31, 2008, including documentation relating to the sale of six motor vehicles, which sales were not disclosed in Debtors' Statement of Financial Affairs ("SOFA"). Debtors did not amend their Schedules E and J until April 1, 2008, and did not file the combined November/December MOR until February 14, 2008. Debtors' failure to amend their Schedules E and J and their failure to timely file their MOR's, combined with Debtors' failure to comply with their other verbal agreements made at the Initial Debtor Interview prompted the UST and MDOR to file the pending motions to convert.

A hearing on the motions to convert was originally scheduled for March 4, 2008. However, prior to the scheduled hearing, Debtors and the UST entered into a Stipulation that was filed on February 29, 2008, and approved by the Court on March 3, 2008.[3] The Stipulation was signed by counsel for the UST and Debtors' counsel and was intended to provide the Debtors "with one final opportunity to remedy the various deficiencies identified by the UST with regard to the bankruptcy case". Pursuant to the approved Stipulation, Debtors agreed to the following:

     1. The debtors shall immediately seek a claims bar date.

     2. The debtors shall file amended Schedules and an amended Statement of Financial Affairs on or before March 14, 2008. The debtors, together with their counsel, shall carefully read and review every line of such amendments to ensure that they are totally accurate and complete in all respects before the debtors sign

---

[3] The Court deems the Stipulation as a consent by the UST to a continuance of the 30-day provision of 11 U.S.C. §1112(3).

new declarations as to their truthfulness under penalty of perjury. All of the information sought in every instance throughout the Schedules and Statement of Financial Affairs shall be provided to the fullest extent sought by the Official Forms. The debtors acknowledge that their answers to various items in their original Schedules were inaccurate and incomplete, including but not limited to the valuation set forth in Schedule B for their rings; and they acknowledge that their answers to various questions in their original Statement of Financial Affairs, including but not limited to Questions 1 and 10, were inaccurate and incomplete. Further, the debtors specifically acknowledge that they need to and will amend Schedules I and J to reflect how they believe they will have sufficient funds to justify the Court's and their creditors' favorable consideration of a Plan of Reorganization, recognizing that their original Schedule J reflected that they would only have $7.92 per month available in net income.  The debtors understand that they have a heavy burden to prove that they will have the resources to fund a successful Plan of Reorganization, given their large unpaid state and federal income tax liabilities, and acknowledge that they will not waste the time of the Court and other parties in interest if a confirmable Plan is not determined to be possible within the near future.

3. The debtors shall file a Disclosure Statement and Plan of Reorganization on or before March 28, 2008. The debtors acknowledge that their exclusivity period to file a Plan will elapse on March 13, 2008, unless extended by the Court. Should the debtors seek an extension, it shall not exceed March 28, 2008.

4. The debtors and their counsel understand and acknowledge the validity of the comments and concerns raised by the UST in his Motion to Convert and Memorandum in Support, and in his Reply to Debtors' Response to the UST's Motion to Convert. They specifically acknowledge the observations taken from the *American Bankruptcy Institute Journal* article quoted in the UST's reply brief and agree that the bankruptcy system cannot function when there are no consequences for disregarding deadlines, rules, and debtors' obligations to cooperate with the UST and other parties in interest in their efforts to obtain information and materials necessary to ensure the proper administration of cases in the bankruptcy system.[4]

---

[4]  The UST's Reply filed February 25, 2008, reads:

In a well written article in the *American Bankruptcy Institute Journal* for July/August 2004, Contributing Editor Dianne Kerns contended "*It's All About Behavior Modification.*" In discussing what to do when lawyers or parties fail to abide by the rules that everyone else must comply with, she wrote:

5. The debtors acknowledge that their Monthly Operating Reports ("MORs") have not always been complete and filed in a timely fashion. They acknowledge that their statutory quarterly fees have not been paid in a timely fashion. Going forward, the debtors and their counsel agree to ensure that all deadlines are timely met, all rules (both local and federal) are complied with, and full cooperation is afforded to the UST and other parties to this bankruptcy case. The debtors and their counsel acknowledge their obligation to timely respond to requests for information and documentation from the UST and other parties in interest, and agree to provide all such information and materials to the UST and others as may be reasonably requested from this date forward.

6. The debtors shall immediately file their MOR for January, and shall file their MOR for February by March 15th. They shall file MORs for all subsequent months on or before the 15th day of the succeeding month.

7. The debtors shall timely comply with all of the provisions of the UST's "Chapter 11 Guidelines and Reporting Requirements for Chapter 11 Debtors" (and acknowledge that they received a copy of the same when this case was commenced).

8. The debtors shall provide copies of the following described documents to the UST and the Montana Department of Revenue ("DOR") on or before March 14, 2008 (all of which were requested by the UST and/or DOR at the time of the debtors' § 341 meeting on January 8, 2008):

(a) The most recent annual and monthly financial statements of debtors' Aflac insurance brokerage business;

---

"[W]hen a judge fails to consistently reprimand unacceptable behavior on the part of attorneys or parties, it is effectively an invitation for the behavior to be repeated."

In reflecting upon what happens when judges allow improper behavior to continue with little or no consequences, Ms. Kerns noted:

"While some lawyers appreciate a judge's deference and will learn from a single experience, other lawyers learn completely different lessons. If they miss a deadline and there is no consequence, they will take their chances with deadlines in the future. If they file inaccurate schedules and they are not caught or there is no reprimand when caught, they will file inaccurate schedules in the future. If they ignore rules of procedure and in so doing obtain a benefit for their clients, they will disregard procedure in the future."

(b) Applications for home and vehicle loans, and the loan agreements for these assets;

(c) An appraisal or market analysis for the debtors' property at 1205 Le Grande Cannon Boulevard, in Helena, Montana;

(d) Monthly statements for each debtor and BCF, Inc. (BCF is a corporate entity wholly-owned by the Fishers) portraying all income and expenses for each of the six months prior to the date of filing;

(e) Auto insurance policies for each vehicle and boat owned by the debtors for the two years prior to the date of filing;

(f) Debtors' agreement with Aflac regarding residuals;

(g) All documents representing sales of the vehicles and boat owned by the debtors for the two years prior to the date of filing;

(h) Bank statements showing proof of the deposit of monies received from the sale of the 1967 Chevrolet Corvette;

(i) Appraisal of the 1967 Chevrolet Corvette, and proof of deposit of sales proceeds for this vehicle;

(j) A copy of the financial statement provided to the Internal Revenue Service in May, 2006; and a completed

(k) Bank collateralization certificate.

9. The debtors and their counsel shall immediately take appropriate measures to recover any preferential transfers made by the debtors prepetition, by following the procedures prescribed by F.R.B.P. 7001(1).

10. The debtors and their counsel shall immediately take appropriate measures to recover any fraudulent conveyances made by the debtors prepetition, by following the procedures prescribed by F.R.B.P. 7001(1). The debtors acknowledge the suspicions of the UST and other parties that various transfers of motor vehicles made within four years prior to the date of the commencement of this case were made for less than fair value, and they agree to fully investigate and pursue such matters in their capacity as fiduciaries to their bankruptcy estate.

11. Separate and apart from the debtors in this case, in the future debtors' counsel agrees personally to take measures reasonably calculated to ensure his

7

compliance and that of his other bankruptcy clients to all local and federal rules and the deadlines contained therein, and agrees that he shall ensure the accuracy and completeness of Petitions, Schedules and Statements of Financial Affairs of all future bankruptcy clients at the time of the commencement of his clients' cases, to extent possible.

12. In the event the debtors do not comply fully with the terms and spirit of this Stipulation, they agree that the Court may immediately convert this case to chapter 7.

As the Court will discuss below, Debtors have failed to comply with several provisions of the approved Stipulation.

DISCUSSION

Prior to enactment of BAPCPA, § 1112(b) provided that a court "may" convert or dismiss a Chapter 11 case for cause. Subsequent to the enactment of BAPCPA, it now appears that the Court's discretion with respect to conversion or dismissal has been somewhat circumscribed:

As amended in 2005, section 1112(b)[5] materially circumscribes the court's discretion to convert or dismiss a chapter 11 case for cause in several important ways. First, section 1112(b)(1) provides that the court must convert or dismiss the case if the movant establishes cause unless the court determines that unusual circumstances exists [sic] establishing that conversion or dismissal would not be in the best interests of creditors and the estate. Second, section 1112(b) directs that the court must convert or dismiss the case for cause unless the provisions of section 1104(a)(3) apply. Section 1104(a)(3) provides that, rather than converting or dismissing the case, the court may appoint a chapter 11 trustee if doing so would be in the best interests of creditors and the estate. Third, section 1112(b) provides that the court must convert or dismiss the case for cause unless the provisions of section 1112(b)(2) apply. Section 1112(b)(2) provides that, absent unusual circumstances, the court may not convert or dismiss the case if certain criteria are satisfied:

(1)    There is a reasonable likelihood that a plan will be confirmed within the timeframes specified in the subsection;

(2)    The grounds for converting or dismissing the case include an act or

---

[5] "It is well established that the enumerated causes set forth in § 1112(b)(4) are not exclusive." *In the Matter of Strug-Division, LLC*, 375 B.R. 445, 448 (Bankr. N.D.Ill. 2007).

> omission by the debtor other than substantial or continuing loss to
> or diminution of the estate and the absence of a reasonable
> likelihood of rehabilitation; and
>
> (3)    There exists a reasonable justification for the act or omission
> demonstrating cause to dismiss the case and the act or omission
> will be cured within a reasonable time fixed by the court.

7 COLLIER ON BANKRUPTCY, ¶ 1112.04, p.1112-20 (15th ed. rev.):

Caughron made perhaps the most telling understatement and concession at the beginning

of the April 1, 2008, hearing when he said: "a number of errors have been made in the process

here."  Sadly, given the number of errors in this case, this Court concludes that the UST has

established cause for the conversion of this case.  Under § 1112(b), the Court must thus convert

this case unless: (1) unusual circumstances establish that conversion is not in the best interest of

creditors and the estate, § 1112(b)(1); or (2) that absent unusual circumstances, Debtors can: (a)

show a reasonable likelihood that a Chapter 11 plan will be confirmed within a reasonable period

of time; and (b) there exists a reasonable justification for Debtors' delay in providing vital

information to the UST and the MDOR.  The other possible alternative to conversion is the

appointment of a trustee if such appointment would be in the best interest of creditors and the

estate.  11 U.S.C. §§ 1112(b)(1) and 1104(a)(3).  As further explained in 7 COLLIER ON

BANKRUPTCY, ¶ 1112.04[3], p.1112-26, 1112-27 (15th ed. rev.):

> As amended in 2005, section 1112(b) provides further direction in
> guiding the court's discretion. To begin with, section 1112(b)(1) directs that the
> court must convert or dismiss the case if the movant establishes cause unless
> the court determines that unusual circumstances exist and the court enumerates
> the circumstances. Although section 1112(b) does not define the phrase
> "unusual circumstances," it clearly contemplates conditions that are not
> common in most chapter 11 cases. Although each chapter 11 case is to some
> extent unique, and unusual circumstances may exist in any particular case
> regardless of its size or complexity, the import of section 1112(b) is that, if
> cause exists, the case should be converted or dismissed unless unusual facts or

circumstances demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding.

In addition, section 1112(b)(1) directs that the court must convert or dismiss the case for cause unless the appointment of a chapter 11 trustee would be in the best interests of creditors and the estate. Under section 1104(a)(3), the court is directed to appoint a trustee if cause exists to convert or dismiss a chapter 11 case and doing so would be in the best interests of creditors and the estate. Notably, when sections 1104(a)(3) and 1112(b) are read together, it seems clear that the court *must* appoint a chapter 11 trustee rather than convert or dismiss the case if section 1104(a)(3) applies. Neither section 1104(a)(3) nor 1112(b) defines what constitutes the "best interests of creditors and the estate." This phrase, however, has long been used in section 1112 and courts have considered a number of factors in applying it.

Finally, section 1112(b)(2) creates an exception to section 1112(b)(1) by directing that, absent unusual circumstances, the court must *not* convert or dismiss the case if (1) there is a reasonable likelihood that a plan will be confirmed within the time frames specified in subsection 1112(b)(2), (2) the grounds for converting or dismissing the case include an act or omission by the debtor other than substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation and (3) there exists a reasonable justification for the act or omission, and the act or omission will be cured within a reasonable time fixed by the court. In establishing the time frames for confirmation of a plan, section 1112(b)(2) refers to sections 1121(e) and 1129(e), providing deadlines for the filing and confirmation of plans in small business cases. If the case is not a small business case, the time frame is designated as "a reasonable period of time." If the movant establishes cause to convert or dismiss the case for substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, then section 1112(b)(2) does not apply. If the movant demonstrates cause to convert or dismiss the case for a reason other than substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, then the court must consider whether there exists a reasonable justification for the act or omission constituting cause for conversion and dismissal, as well as whether the act or omission can be cured within a reasonable time fixed by the court. Yet if cause for conversion or dismissal exists because the debtor filed its chapter 11 case in bad faith, then section 1112(b)(2) would not apply because, by determining that the debtor filed the case in bad faith, the court would foreclose a reasonable justification for the filing. In addition, a bad faith determination would likely constitute "unusual circumstances" demonstrating that section 1112(b)(2) should not be applied. If the court declines to apply section 1112(b)(2) on the basis of the existence of

10

unusual circumstances, the court must enumerate those circumstances.
As noted earlier, the UST has satisfied his burden by establishing cause, as defined in §
1112(b)(4)(B), for conversion under § 1112(b)(1) based upon Debtors' failure to satisfy the
burdens imposed upon them by the Bankruptcy Code and as agreed in the Stipulation between
Debtors and the UST.

Starting with the Stipulation between Debtors and the UST, the record shows that
Debtors have not yet requested a claims bar date.  The Court would note, however, that on April
1, 2008, at 00:56 a.m., Debtors filed an amended petition (now asserting that "Debtor is a small
business debtor as defined in 11 U.S.C. § 101(51D)"), amended Schedules A, B, C, D, E, F, I, J,
and an amended Statement of Financial Affairs.  Debtors' Amended Schedule D lists five
separate creditors with gross claims totaling $1,434,429.53.  Debtors' Schedule E lists the IRS
and MDOR, who are also listed as secured creditors on Schedule D, as having claims totaling
$130,038.97, of which $128,132.01 is listed as priority and $9,502.20 is listed as "amount not
entitled to priority".[6]  Brad testified that Debtors will also owe taxes to the IRS and MDOR for
2007.  Debtors' tax obligations for 2007 are not reflected on the amended Schedule E, but
Debtors' proposed Plan of Reorganization reflects that Debtors' income tax liability for 2007 is
$28,534.  Debtors' Amended Schedule F lists an additional 30 or so creditors with claims
totaling $100,183.00.  None of the aforementioned claims are listed by Debtors as contingent,
unliquidated or disputed.  Under F.R.B.P. 3003(b)(1) [Interim], a debtor's "schedule of liabilities
filed pursuant to § 521(1) of the Code shall constitute prima facie evidence of the validity and

---

[6]  Kim Davis of the MDOR testified that Debtors under-reported their 1099 income on
their 2006 tax return by $26,896.00.

amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated."[7]  Therefore, as it stands today, all claims listed by Debtors on their Schedules D, E and F constitute prima facie evidence of the validity and amount of the claims of the listed creditors.

As just mentioned, Debtors did not amend their Schedules and SOFA until April 1, 2008, even though Debtors, through counsel, agreed to amend their Schedules and SOFA by March 14, 2008.  Caughron stated at the hearing that he met with Debtors between 11:00 p.m. March 31, 2008, and 1:00 a.m. April 1, 2008, because that was the only time that Debtors and Caughron could get together.  In addition to admittedly not filing amended Schedules and a SOFA in the time period required by the Stipulation, Jensen, during his examination of Brad, inquired as to whether Debtors had carefully read and reviewed every line of their April 1, 2008, amendments to ensure that they were totally accurate and complete in all respects before Debtors signed the new declarations as to their truthfulness under penalty of perjury, as specifically required by the Stipulation.  Brad responded that Debtors did not go through the amendments line by line.  In fact, Brad testified that he had not seen a hard copy of Debtors' amended Schedules and SOFA, and had not signed such Schedules and SOFA at the time of the hearing.[8]  Brad later testified that during Debtors' two hour meeting with Caughron, Debtors were asked questions by Caughron, and clarified certain information.  Caughron recorded Debtors' responses and clarifications in

---

[7]  The section of interim Rule 3003 quoted in this Memorandum of Decision is identical to prior Rule 3003.

[8]  Caughron affixed Debtors' electronic signatures to the amended Schedules and SOFA filed April 1, 2008, indicating that Debtors had signed the Schedules and SOFA, when in fact they had not.

Caughron's computer.  Rather than reviewing their Schedules and SOFA line by line, it appears that Debtors only considered those questions or issues raised by Caughron.  Debtors thus failed to comply with provision 2 of the Stipulation.

Contrary to their voluntary petition, which explicitly states that "Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D)", and the approved Stipulation, Debtors filed a "Notice of Exclusivity and Acceptance Periods" on March 13, 2008, wherein Debtors assert that "notwithstanding terms in their recent stipulation with the US Trustee to the contrary, the exclusivity and acceptance periods do not expire in this case until 180 days following the petition date, or May 12, 2008."  Debtors' Notice goes on to request that the "Court recognize the exclusivity and acceptance periods provided by statute."  The MDOR filed a Motion to Strike Notice and Exclusivity and Acceptance Periods on March 17, 2008, and per Debtors' response thereto filed March 18, 2008, a hearing on that matter is scheduled for May 13, 2008.

In support of their new claim of being a "small business debtor," which claim is contrary to their original voluntary petition, Debtors amended their voluntary petition on April 1, 2008, indicating that Debtors were "a small business debtor as defined in 11 U.S.C. § 101(51D)."  Although it does not appear that § 101(51D) is restricted to debtors who are engaged in commercial or business activities at the time the petition is filed, *see* 2 COLLIER ON BANKRUPTCY, ¶ 101.51D,  Debtors' recently expressed desire to be considered as small business debtors puts Debtors at odds with 11 U.S.C. § 1116, which outlines the duties of debtors in small business cases.  In particular, subsection (1) of § 1116 provides that a debtor in possession, shall "append to the voluntary petition . . . (A) its most recent balance sheet, statement of operations, cash-flow statement, and Federal income tax return; or (B) a statement made under penalty of

13

perjury that no balance sheet, statement of operations, or cash-flow statement has been prepared and no Federal tax return has been filed[.]" It does not appear that Debtors have complied with either of the above two provisions.

Notwithstanding Debtors' apparent confusion as to whether they are or are not a "small business debtor" and whether Debtors must comply with the deadlines attendant thereto, Debtors filed a Plan of Reorganization on March 24, 2008. Debtors have not, to date, filed a Disclosure Statement, arguing instead at the April 1, 2008, hearing that this case involves two very sophisticated creditors--the IRS[9] and MDOR–who should be able to ascertain all pertinent information from Debtors' Plan of Reorganization and thus, under 11 U.S.C. § 1125(f), Debtors should not have to go through the expense of filing a Disclosure Statement.[10] Caughron's reference to this case as a two-creditor case is troubling because Caughron wholly fails to account for the other 30 or so creditors, in addition to the IRS and the MDOR, that Debtors have listed in their Schedules. Moreover, Debtors' eleventh hour attempt to designate themselves as a

---

[9] Brad testified that Debtors failed to file tax returns for numerous years and conceded that there was at least one year where Debtors had 1099 income in excess of $500,000.00, but paid little if any income taxes on such income. Caughron referred to the IRS as a "1,000 pound gorilla" because their liens far outweigh everything else in the case. Indeed, the Proof of Claim filed by the IRS in this case asserts a secured claim in the amount of $1,275,051.48, a priority claim of $80,149.78 and an unsecured claim of $200.00. The MDOR has filed three proofs of claim asserting secured claims totaling $146,576.10, priority claims totaling $29,856.42 and unsecured claims totaling $4,847.52.

[10] Debtors' confusion is also reflected in their Plan of Reorganization, page 2, where Debtors first state that "[a]ll creditors and holders of equity interest should refer to the Disclosure Statement (as that term is defined herein) for a discussion of the Debtors' history, business, properties, results of operations and financial projections for future operations and for a summary and analysis of the Plan and certain related matters." At the bottom of page 2, Debtors' Plan continues: "Pursuant to Section 1125(f)(1), Debtors hereby request that the Court determine that the following Plan itself provides adequate information to Creditors, and that a separate disclosure statement is not necessary."

small business does not relieve Debtors of their obligation to comply with the Stipulation they voluntarily entered into with the UST, wherein Debtors agreed to file a Disclosure Statement on or before March 28, 2008.

Jensen also briefly touched on some of the items listed in paragraph 8 of the Stipulation. Brad could not state whether Debtors had provided the UST with their most recent annual and monthly financial statements of Debtors' Aflac insurance brokerage business or the bank statements showing proof of the deposit of monies received from the sale of Debtors' 1967 Chevrolet Corvette. Brad testified that Debtors did not have any home or vehicle loan applications or loan agreements. Brad did not understand the UST's request for copies of auto insurance policies for each vehicle and boat owed by Debtors for the two years prior to Debtors' petition date.

Finally, Brad testified that he did not have any transfer documents showing the sale of the six vehicles and the boat. With respect to the six vehicles, including the 1967 Chevrolet Corvette previously mentioned, and the boat, Debtors answered "none" in response to Question 10 of the SOFA, which requires that debtors list "all other property . . . transferred . . . within two years immediately preceding the commencement" of a case. However, when the MDOR ran a motor vehicle search, it discovered that Debtors had transferred 6 cars and a boat within the 2-year time frame. Once the MDOR brought the transfers to light, the UST instructed Debtors to amend their SOFA to disclose the transfers. Brad explained that he did not disclose the transfers in the original SOFA because he misunderstood the term "transfer" and no one explained the word "transfer" to Debtors. Debtors' amended SOFA filed April 1, 2008, discloses seven transfers that occurred between October of 2005 and November 5, 2007 (the final transfer made only 6 days

prior to Debtors' petition date), and resulted in Debtors obtaining funds of at least $102,500.00, along with a 1996 Cadillac Seville.  With respect to the 1967 Chevrolet Corvette, Brad testified that he sold that car to a friend who deals in classic cars.  Brad stated that his friend purchased the car as a dealer and paid a fair price.  Brad never looked at "the books" on the car and acknowledged that he could have got more for the car on eBay.  Brad explained that one fact impacting the selling price was that Brad has the option to repurchase the Corvette if the friends decides to sell it at some future date.

Following the Initial Debtor Interview, Debtors filed a Motion to Recover Preferential Payments to Creditors on February 4, 2008.  In an Order entered February 20, 2008, the Court denied the aforementioned motion on the basis that:

> Debtors' motion seeks to recover payment to the above-named creditors as preferences under 11 U.S.C. § 547.  Proceedings to recover money or property are adversary proceedings under F.R.B.P. 7001(1).  None of the exceptions listed in Rule 7001(1) apply to Debtors' requests to recover preferential payments from creditors.  F.R.B.P. 9014(a) allows relief to be requested by motion in contested matters "not otherwise governed by these rules."  Since Rule 7001(1) governs, Debtors' motion constitutes improper procedure to recover preferences.

Debtors have not since filed an adversary proceeding to recover the alleged preferential payments to creditors Target, Associates/CitiBank, Beneficial/Household Finance, or CitiBank/Sears, even though Debtors agreed to "immediately take appropriate measures to recover any preferential transfers made by the debtors prepetition, by following the procedures prescribed by F.R.B.P. 7001(1)."

Similarly, Debtors have not done anything to investigate or recover potential fraudulent conveyances even though Debtors agreed in paragraph 10 of the Stipulation to "immediately take appropriate measures to recover any fraudulent conveyances made by the debtors prepetition."

16

Brad explained that Debtors do not feel they have made any fraudulent conveyances, and thus, they have not made any effort to investigate the conveyances that the UST suspects may have been fraudulent.

In addition, per the amended Schedules I and J, Debtors' monthly income increased to $12,232.87 (from the $9,218.87 listed in Debtors' original Schedules) and Debtors' monthly expenses were reduced to $6,180.41 (from the expenses of $9,210.95 listed in Debtors' original Schedule J), leaving Debtors with $6,052.46 of monthly net income, as opposed to the amount of $7.92 as set forth on Debtors' original Schedule J.  The increase in Debtors' combined average monthly income between December 11, 2007, and April 1, 2008, is attributable solely to an increase in Brad's disclosed regular income from operation of a business–which Debtors increased from $5,430.00 to $8,444.00.  Although Brad has not sold an Aflac insurance policy since about 2005, Brad still receives commissions from the renewal of insurance policies previously sold by Brad, and Brad's present business income relates solely to the Aflac renewal commissions.  Debtors' original disclosure of business income is supported by a Business Income and Expenses sheet which reflects that Debtors' received gross income of $90,000.00 for the 12 months prior to filing their bankruptcy petition.  Debtors also estimate that their average future gross monthly income would be $7,000.00, which amount would be offset by rent of $800.00, utilities of $500.00, office expenses and supplies of $200.00 and storage of $70.00. The Court does not see where Debtors have filed an amended Statement of Business Income and Expense to support their amended business income figure of $8,444.00.

At any rate, Brad's 1099 income from Aflac in 2007 was $112,589.62, or roughly

$9,382.47 per month.[11]  Brad's 1099 income will admittedly decrease in 2008, but Brad testified

that Debtors were moving the Aflac office to their home, thereby saving the rent expense of

$800.00 and the utility expense of $500.00.[12]  Brad testified that his office expenses would also

decrease.  Indeed, Brad testified at the hearing that he has not paid rent since early January and

also stopped paying the business utilities in October or November of 2007.

Debtors also amended their Schedule J to adjust various expenses, including reducing

Debtors' monthly cellular telephone expense from $400.00 to $200.00, reducing Debtors'

monthly clothing expense from $627.42 to $100.00, reducing Debtors' monthly recreational

expense from $500.00 to $55.00 and reducing Debtors' auto payments from $1,640.00 to

$492.00.

In another instance, Debtors' original Schedule B includes rings valued at $2,500.00.

Debtors' amended Schedule B filed April 1, 2008, shows that such rings have a fair market value

of $8,785.00 and a liquidation value of $2,928.00.  When asked by Jensen about the value of the

rings, Brad explained:

Jensen:  We noted that you have a couple of rings that have been appraised for $9,950.00

---

[11]  Brad's 2006 and 2007 income from Aflac comports with the revenues listed by Debtors in response to Question 1 of the SOFA.  However, when questioned by the MDOR at Debtors' 341(a) meeting of creditors held January 8, 2008, Brad agreed that his 1099 income from Aflac was $315,972.00 in 2005 and $571,696.00 on 2004.  Debtors disclosed Brad's 1099 income from Aflac for 2005 as "205,683.00 2005 Income - $2,496 Schedule D Gains, balance from Business".

[12]  Brad testified that the lease for his business premises was month-to-month, but the lease is not disclosed anywhere in Debtors' original or amended Schedules.  The only disclosure of the lease is Debtors' response to Question 3 of the amended SOFA wherein Debtors disclose that they paid Dan Wing $1,600.00 between, it appears, October 29, 2007, and November 5, 2007.

and nearly $3,000.00.  Are these the same two rings that you listed in your Schedule B as

having a combined value of $2,500.00?

Brad:  I put garage sale values on them. I am not a jeweler.  I don't know the value of

rings, but yes, those would be our wedding rings and that is what I put on there.

Also, Debtors' original Schedule B failed to disclose Brad's income from the Aflac

insurance renewals.  Debtors' amended Schedule B now lists "[r]ight to future income from

Aflac insurance renewals" but lists the current value of such income stream as $0.00.  Brad

testified that he did not assign a value of $0.00 to the income stream, agreeing that the income

stream did in fact have a value.  Brad went on to explain that perhaps his attorney was the person

who had assigned a value of $0.00 to the future Aflac income payments.  This is one of many

instances where Debtors may have discovered the inaccuracy had they carefully reviewed their

Schedules and SOFA as they agreed to do in the Stipulation.

When Debtors amended their Schedules on April 1, 2008, Debtors also added $4,000.00

of cash on hand (kept in Debtors' pockets and a drawer at home) and added an additional

$2,518.88 in funds in checking and savings.  When Brad was asked by Butler to explain why

Debtors did not include the $6,518.88 of cash and checking or savings to their original

Schedules, Brad stated that Debtors were pressed for time when they filed their Schedules, so

they just inserted figures.  Debtors also failed to list Brad's 401k from Lithia Chevrolet of Helena

in their original Schedules, but added the asset in their amended Schedules.  The Court is not

persuaded by Debtors' argument that they were simply too pressed for time to file accurate

Schedules and SOFA because Debtors, in response to Question 9 of the amended SOFA, disclose

that Debtors met, or at least paid Caughron money, on October 29, 2007.  Debtors did not file

19

their Schedules and SOFA until December 11, 2007. Thus, it would appear to this Court that

Debtors had a period of 43 days to prepare and file accurate Schedules and SOFA.

As the Ninth Circuit Bankruptcy Appellate Panel wrote: "The efficacy of the bankruptcy

system depends in important aspects on accurate self-reporting by debtors. Debtors and

bankruptcy professionals who do not fulfill their obligations deserve to be chastised severely."

*In re An-Tze Cheng*, 308 B.R. 448, 458 (9th Cir. 2004), *aff'd.*, 160 Fed.Appx. 644 (9th Cir. 2005).

This Court has also discussed a debtor's responsibility in completing schedules and statements of

financial affairs in *Torgenrud v. Wolcott (In re Wolcott)*, 194 B.R. 477, 486 (Bankr. D. Mont.

1996):

> As to the false declarations in Wolcott's Schedules and Statement of Affairs, the preparation and filing of such documents for the Bankruptcy Court "is no idle task." *Torgenrud v. Smith (In re Smith )*, 14 Mont.B.R. 228, 232 (Bankr. D. Mont.1995). Courts take a very dim view of the " 'intentional and fraudulent omission of property from sworn schedules [which] amounts to an offense punishable by the Criminal Code.' " *In re Woodson*, 839 F.2d 610, 614 (9th Cir.1988). "Numerous cases hold that the debtor has a duty to prepare schedules carefully, completely and accurately." *In re Mohring*, 142 B.R. 389, 394 (Bankr.E.D.Cal.1992), *aff'd mem.*, 153 B.R. 601 (9th Cir. BAP 1993), *aff'd mem.*, 24 F.3d 247 (9th Cir.1994). Moreover, a debtor must correct such documents filed with a court upon learning of their inaccuracy or incompleteness. *Id.* The debtor has "no discretion in this regard." *Smith*, 14 Mont.B.R. at 233. Furthermore, a debtor has an affirmative duty to "cooperate with the trustee in preparing a 'complete inventory of the property of the debtor.' " *Mohring*, 142 B.R. at 394. Failure to follow these precepts results in denial of a debtor's general discharge for harboring an intent to conceal property. 11 U.S.C. § 727(a)(2); *Devers*, 759 F.2d at 753-754.

> In the case *sub judice*, Wolcott's actions fly in the face of the foregoing dictates. The Court identified at least six flat falsehoods contained in Wolcott's Schedules and Statements of Affairs. Furthermore, in written arguments filed with the Court, Wolcott boldly admitted to concealing from the Trustee a $45,000 asset. These flagrant violations of Wolcott's clear duty of honesty and forthrightness in the conduct of Wolcott's bankruptcy clearly demonstrate a calculated intent to conceal property. Thus, once again, even construing the evidence against Wolcott in the most lenient light, the Court finds 11 U.S.C. § 727(a)(2) altogether satisfied.

A debtor's bankruptcy schedules must be verified or contain an unsworn declaration under penalty of perjury.  28 U.S.C. § 1746; F.R.B.P. Rule 1008; *Searles*, 317 B.R. 368, 377 (9th Cir. BAP 2004).   The case of *In re Leija*, 270 B.R. 497, 502-03 (Bankr. E.D. Cal. 2001), dealt with omissions in a debtor's schedules in the context of § 727(a)(4)(A).  Although the Court in *Leija* was discussing inaccurate schedules in the context f § 727(a)(4)(A), its reasoning is applicable in the instant case:

> Sworn statements filed in any court must be regarded as serious business.  In bankruptcy administration, the system will collapse if debtors are not forthcoming.  The record in this case shows, at the very least, cavalier indifference and a pattern of disdain for the truth.  Meaningful disclosure was accorded too low a priority. [*Tully*, 818 F.2d at 112].

> If Mr. Leija read the verifications before signing them, the error would have been obvious.  If Mr. Leija did not read the verifications before signing them, then his actions were at best, recklessly indifferent.  Either way, the shoddy practice of verifying *blank* pleadings to be filed in a judicial proceeding cannot be condoned by this court.

*Leija*, 270 B.R. at 503-04.

When debtors and their counsel are so cavalier about their duties and responsibilities as prescribed by the Bankruptcy Code and Rules, and fail to abide by agreed upon deadlines, the remedy must be appropriate to punish the current conduct and to deter such conduct in the future.  In this case, Debtors' failure to provide requested information in some instances, and failure to provide information in a timely manner in other instances, is a clear indication to this Court that Debtors and their counsel do not take this bankruptcy, and the burdens attendant thereto, seriously.  It is plainly evident that accurate schedules and statements are not important to these Debtors and their counsel.  This Court will not condone Debtors' and Caughron's cavalier indifference to the burdens imposed upon Debtors by the Bankruptcy Code and Rules and finds

21

that conversion is the appropriate remedy to punish Debtors' conduct and the deter such conduct in the future.

    While dismissal of this case may not provide any advantage to Debtors' creditors, conversion to Chapter 7 of the Bankruptcy Code will allow for the appointment of a Chapter 7 Trustee who can liquidate any non-exempt assets in an expeditious manner.  A Chapter 7 trustee would also, no doubt, investigate Debtors' alleged fraudulent conveyances and would pursue vigorously Debtors' preference actions.  The conversion of this case to Chapter 7, as opposed to the appointment of a trustee under § 1112(b) and § 1104(a)(3), would also better serve the creditors in this case, where Debtors have no ongoing business to preserve, in that the creditors would not be burdened with the higher fees associated with the administration of a Chapter 11 case.

    Given the absence of any unusual circumstances, other than Debtors' financial predicament, the Court's final focus now shifts to whether Debtors have shown a reasonable likelihood that a Chapter 11 plan will be confirmed within a reasonable period of time; and have provided a reasonable justification for their failure to timely provide the UST and the MDOR with crucial documents.  Caughron advised the Court during his initial comments at the hearing that it was inappropriate for the Court to consider the pending motions to convert given the Plan of Reorganization before the Court.  However, Caughron conceded that the Plan before the Court needs modification.

    Moreover, the feasibility of Debtors' Plan of Reorganization hinges in large part on Brad's commission income from Aflac, shown at $8,444.00 in Debtors' amended Schedule I. Brad agreed at Debtors' 341(a) meeting of creditors that his 1099 Aflac income in 2005 was

22

$315,972, while such income decreased to $168,073.99 in 2006 and decreased again in 2007 to $112,589.62.[13]  Brad testified that his monthly income from Aflac would only decrease by an additional 5 to 8 percent per year.  An 8 percent increase from 2006 to 2007 would have, based upon Brad's income in 2006, resulted in Brad receiving income of roughly $154,628.07 in 2007.  As previously noted, Brad's 2007 Aflac income was $112,589.62, a decrease of roughly 33 percent from 2006.[14]  Debtors' historical data simply does not support Debtors' lofty future projections.

Debtors' estimate of their future monthly income is similarly not substantiated by Debtors' MOR's.  If appears from the combined November/December MOR that Debtors earned combined net wages totaling $3,919.34.  Debtors also disclose Aflac income of $7,791.52, which amount may be subject to income taxes.  Adding the foregoing two figures shows total income of $11,710.86.  From the foregoing, Debtors show $9,682.90 ($4,256.70 of business disbursements, $3,838.67 personal disbursements for November and $1,587.53 personal disbursements for December ), leaving Debtors with a negative balance of $153.12 in their business checking account on December 31, 2007, and a balance of $615.36 in their personal checking account.

In January, Debtors report Aflac income of $10,219.98, which amount does not appear to reflect any type of income tax.  The foregoing amount was subject to disbursements of $8,571.67, which should have left Debtors with, considering the negative $153.12 beginning

---

[13]  In the original SOFA, Debtors' disclosed the Aflac income as $78,750.00 in 2007 and $120,000.00 in 2006.

[14]  Butler asked Brad what he received from Aflac in January or February of 2008 and Brad could not say because he said the IRS was levying said funds.  However, Debtors received a notice of release of the levy about a week prior to the April 1, 2008, hearing.

balance, an ending cash balance of $1,495.19.  However, Debtors assert that as additional

$12,560.63 was removed from the account for a "Levy" that was made through Aflac.[15]  Debtors'

thus reach the accurate, but absurd conclusion that their business account had an ending cash

balance of a negative $1,066.42.  Debtors also received personal wages of $5,605.44 and had

disbursements of $5,874.46, resulting in a negative cash flow of $269.02 for the month of

January, but Debtors' bank statements reflect that Debtors' personal accounts had a total of

$3,701.40 as of January 31, 2008.  Between all accounts, Debtors ending cash balance on January

31, 2008, was $2,634.98, an improvement of $2,172.74 over their December 31, 2007, cash

balance.

Debtors did not fare so well in February.  Per the business income statement, Debtors

received $7,229.94 from Aflac in February 2008.  The income was, according to the revised

Statement of Business Receipts and Disbursements, subject to disbursements of $8,320.01.  Such

amounts do not reconcile with the bank statement for the business account, which shows a

beginning balance of a negative $1,066.42, deposits and other additions of $1,336.93, which

amount includes a write-off by Mountain West Bank of $1,090.07 on February 21, 2008, to close

the account, and deductions of $270.51, leaving the account with an ending balance of $0.00.

Debtors other wages in February either totaled $5,204.90 per the Statement of Personal

Receipts and Disbursements or $6,223.50 per the Monthly Income and Expense Statement.  Per

both statements, Debtors' disbursements in February were $4,123.76.  In contrast, Debtors' DIP

checking account started with a beginning balance of $3,410.70.  Debtors made five deposits

---

[15]  To make Debtors' numbers work, the alleged levy would have been $2,561.61, rather than $12,560.63.

totaling $4,524.36 and had numerous disbursements totaling $6,804.73, leaving Debtors with a ending cash balance of $1,130.33.  Debtors have another $283.73 in a separate personal account.

In sum, the evidence shows that Debtors' cash position has declined since Debtors filed their bankruptcy petition, even though Debtors have not made a single plan payment.  Debtors attempted to explain at the hearing that their dismal cash position was due in part to the fact that the IRS was levying Brad's Aflac income.  Debtors claim that the IRS has seized, post-petition, $7,448.20 of Brad's Aflac income.  However, Debtors offered not a single shred of evidence to substantiate their assertion.  Debtors also maintain that Aflac charged Debtors $3,843.26 for a correction but Debtors, once again, offered not a single shred of evidence to substantiate their claim and in fact, could not state what the correction involved.

This Court concludes that Debtors cannot possibly fund a plan of reorganization that contemplates monthly plan payments of $6,052.00 and estimated tax payments of $480.00 per month.  Debtors have less cash on hand now then they did when this case was commenced.  Consequently, even if Debtors now had the $7,448.20 they claim was seized by the IRS and even if they had the $3,843.26 from the Aflac correction, they would still only have an additional $11,448.20 to add to their February 29, 2008, cash balance of $1,414.06, or $12,862.26, which amount would barely make the payments that would have hypothetically been due in December and January, leaving Debtors with insufficient cash to make their estimated tax payments and the additional plan payment that would have been due in February.  Simply put, Debtors have failed to show a reasonable likelihood that their Plan of Reorganization could, in any way, be confirmed within a reasonable period of time.

For the reasons discussed above, the Court finds that conversion of this case to Chapter 7

of the Bankruptcy Code, and appointment of a Chapter 7 trustee to administer the remaining assets of Debtors' bankruptcy estate, is in the best interest of Debtors' creditors.  Thus, consistent with this Memorandum of Decision, the Court will enter a separate order providing as follows:

IT IS ORDERED that the Motions to Convert filed by the United States Trustee and the Montana Department of Revenue on February 4, 2008, and February 5, 2008, respectively, are granted; and this case is converted to Chapter 7 of the Bankruptcy Code.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

26